348 F.3d 789
 FRIENDS OF YOSEMITE VALLEY; Mariposans for Environmentally Responsible Growth (MERG), Plaintiffs-Appellants,
v.
Gale NORTON; United States Department of the Interior; National Park Service; John Reynolds; David A. Mihalic, Defendants-Appellees.
 No. 02-16037.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 11, 2003 — San Francisco, California.
 Filed October 27, 2003.
 
 COPYRIGHT MATERIAL OMITTED Julia A. Olson, Wild Earth Advocates, Oakland, California; Sharon E. Duggan, Berkeley, California, for the appellants.
 Thomas L. Sansonetti, Assistant Attorney General, Environment & Natural Resources Division; John K. Vincent, United States Attorney; E. Robert Wright, Assistant United States Attorney; Elizabeth A. Peterson, Charles R. Shockey, David C. Shilton, Attorneys, United States Department of Justice, Washington, D.C., for the appellees.
 Peter M.K. Frost, Western Environmental Law Center, Eugene, OR, for amici curiae Sierra Club, et al.
 Appeal from the United States District Court for the Eastern District of California; Anthony W. Ishii, District Judge, Presiding. D.C. No. CV-00-06191-AWI.
 Before: Alfred T. GOODWIN, A. Wallace TASHIMA, and Kim McLane WARDLAW, Circuit Judges.
 OPINION
 WARDLAW, Circuit Judge.
 
 
 1
 The Merced River flows through the glaciated Yosemite Valley and then cuts more steeply, westward, through the Merced River Gorge and some of the region's oldest rock formations. This appeal challenges the sufficiency of the remedy granted by the district court in Friends of Yosemite Valley v. Norton, 194 F.Supp.2d 1066, 1071 (E.D.Cal.2002). The district court granted only part of the declaratory and injunctive relief sought by Friends of Yosemite Valley and Mariposans for Environmentally Responsible Growth (collectively, "Friends") against the National Park Service ("NPS") for alleged deficiencies in the Merced Wild and Scenic River Comprehensive Management Plan ("CMP"). Friends contends that the NPS failed to prepare a valid CMP to protect and enhance the natural values of the Merced River, thereby violating the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. § 1271 et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, et seq. The district court rejected each of Friends' claims.
 
 
 2
 We agree with Friends that the CMP (1) inadequately addresses user capacities by failing to set the "maximum quantity of use" for the river area and (2) too narrowly defines the boundaries for the El Portal segment of the Merced and, therefore, we reverse in part. We affirm in part, however, because the district court correctly determined that (1) the CMP's data and information satisfied the requirements of both the WSRA and NEPA, (2) it had jurisdiction over Friends' water pollution claim under the WSRA, and (3) the NPS cooperated with the Environmental Protection Agency and the California Regional Water Quality Control Board.
 
 I. PROCEDURAL BACKGROUND
 
 3
 In a prior action challenging the NPS's failure to comply with the WSRA by neglecting to develop a CMP for the Merced, the district court ordered the agency to "prepare and adopt a valid Comprehensive Management Plan pursuant to 16 U.S.C. § 1274(d) in regard to the Merced River as designated under the [WSRA] no later than twelve months after the entry of this decision." Sierra Club v. Babbitt, 69 F.Supp.2d 1202, 1263 (E.D.Cal.1999). Following a brief extension of the deadline, and after completing the NEPA process, the NPS published the Merced Wild and Scenic River Comprehensive Management Plan on August 9, 2000, with a revised record of decision being signed on November 3, 2000.
 
 
 4
 In the present litigation, Friends challenges the validity of the CMP.[1] Following a bench trial on November 6, 2001, the district court ruled that the NPS did not violate the court's prior Sierra Club order requiring the agency to prepare and adopt a valid CMP pursuant to 16 U.S.C. § 1274(d), and concluded that the CMP as issued did not violate the WSRA, NEPA, or the APA. Friends of Yosemite Valley, 194 F.Supp.2d at 1127-28.
 
 
 5
 On appeal, Friends argues that: (1) the CMP inadequately "address[es] ... user capacities," in violation of the WSRA, 16 U.S.C. § 1274(d)(1); (2) the boundaries selected by the NPS for the portion of the river flowing through El Portal disregard the WSRA's mandate that the river area must be "administered in such manner as to protect and enhance the values which caused it to be included in [the wild and scenic rivers system]," 16 U.S.C. § 1281(a); (3) the NPS prepared the CMP (which incorporates the final EIS) as a programmatic document and, as such, it contains insufficiently specific data and information, in violation of the WSRA, 16 U.S.C. §§ 1274(d)(1), 1281(a), NEPA, 42 U.S.C. § 4321 et seq., and NEPA's implementing regulations, 40 C.F.R. § 1500 et seq.; and (4) the NPS has failed to cooperate with federal and state agencies to eliminate or reduce pollution of the Merced River, in violation of the WSRA, 16 U.S.C. § 1283(c).
 
 II. JURISDICTION AND STANDARD OF REVIEW
 
 6
 We have jurisdiction over this appeal under 28 U.S.C. § 1291. We review the district court's findings of fact after a bench trial for clear error and its conclusions of law de novo. See Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1088 (9th Cir.2002). We review the NPS's actions under the WSRA and NEPA pursuant to the APA, which states that a decision may be set aside "only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Hells Canyon Alliance v. United States Forest Serv., 227 F.3d 1170, 1176-77 (9th Cir.2000).
 
 
 7
 The determination whether the NPS acted in an arbitrary and capricious manner rests on whether it "articulated a rational connection between the facts found and the choice made." Pub. Citizen v. DOT, 316 F.3d 1002, 1020 (9th Cir.2003). "[C]ourts must carefully review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors, and may not rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute ...." Id. Nevertheless, we "may not substitute [our] judgment for that of the agency [but] must simply ensure that the agency has adequately considered and disclosed the environmental impact of its actions, bearing in mind that NEPA exists to ensure a process, not particular substantive results." Hells Canyon, 227 F.3d at 1177.
 
 III. THE MERCED RIVER
 A. The Wild and Scenic Rivers Act
 
 8
 Congress enacted the WSRA in 1968 to identify and protect certain "rivers which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values." 16 U.S.C. § 1271. The WSRA establishes that its component rivers "shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations." Id. In addition to initially designating certain rivers to the National Wild and Scenic Rivers System ("WSRS"), see id. § 1274(a)(1)-(a)(8), the WSRA provided that other rivers may be added to the WSRS, including through congressional amendment of the WSRA. See id. § 1273(a)(i).
 
 
 9
 The WSRA protects designated WSRS segments and surrounding areas by implementing certain conservation measures. See id. § 1278 (restricting construction of water resources projects, such as dams, water conduits, and reservoirs); id. § 1279 (restricting sale of public lands); id. § 1280 (providing regulatory authority over new mining and mineral leasing claims). It also sets forth a framework for ongoing management of designated WSRS areas.
 
 
 10
 The location of a WSRS segment determines whether it is administered by the Secretary of the Interior, including the NPS, or the Secretary of Agriculture. See id. § 1281(c), (d). The administering agency must manage each WSRS segment "in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." Id. § 1281(a). "[P]rimary emphasis" is to be given to "protecting ... esthetic, scenic, historic, archaeologic, and scientific features." Id. "Management plans for any [WSRS] component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area." Id. Nevertheless, to the extent that the WSRA conflicts with the Wilderness Act, id. §§ 1131-1136, or statutes administering the national park system and national wildlife system, the WSRA mandates that "the more restrictive provisions shall apply." Id. § 1281(b), (c).
 
 
 11
 The WSRA also requires the administering agency to "take such action respecting management policies, regulations, contracts, [and] plans ... as may be necessary to protect such rivers in accordance with" the WSRA, and "cooperate with the... Environmental Protection Agency and appropriate state water pollution control agencies for the purpose of eliminating or diminishing the pollution of waters of the river." Id. § 1283(a), (c).
 
 
 12
 The designation of a river as part of the WSRS triggers several statutory deadlines. First, within one year of the designation, the administering agency is required to establish "detailed boundaries" for the river that "shall include an average of not more than 320 acres of land per mile measured from the ordinary high water mark on both sides of the river." Id. § 1274(b). Second, the administering agency must prepare a "comprehensive management plan ... to provide for the protection of the river values," within three full fiscal years of the designation. Id. § 1274(d). The CMP "shall address resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the [WSRA's] purposes." Id.
 
 B. Designation of the Merced
 
 13
 In 1987, Congress designated segments of the Merced River to the WSRS, including sections flowing through Yosemite National Park ("Yosemite") and Yosemite's administrative site, El Portal. See An Act to Amend the Wild and Scenic Rivers Act by Designating a Segment of the Merced River in California as a Component of the National Wild and Scenic Rivers System, Pub. L. No. 100-149, 101 Stat. 879 (Nov. 2, 1987) (codified at 16 U.S.C. § 1274(a)(62)(A)) (designating approximately 71 miles of the Merced's main stem and approximately 43 miles of its south fork). The NPS administers the approximately 81 miles of the designated section falling within national park lands. The remainder of the Merced's designated portion is administered by the Secretary of the Interior through the Forest Service and the Bureau of Land Management.
 
 
 14
 In designating the Merced, Congress also provided that the establishment of WSRA boundaries for, and classification of, those parts of the Merced falling within Yosemite or El Portal would be accomplished through amendment of the 1980 General Management Plan for Yosemite. Congress mandated that any such amendment "shall assure that no development or use of park lands shall be undertaken that is inconsistent with the designation of such river segments." 16 U.S.C. § 1274(a)(62)(A).
 
 C. The Merced River CMP
 
 15
 The CMP provides seven management elements that govern all future actions affecting the designated portions of the Merced under the NPS's administration. In an effort to comply with specific provisions of the WSRA, the CMP: (1) delineates river area boundaries, see 16 U.S.C. § 1274(b); (2) classifies segments of the designated section as wild, scenic, or recreational, see id.; (3) describes the "outstandingly remarkable values" ("ORVs") of each area, see id. §§ 1271, 1281(a); and (4) provides for compliance with the WSRA's restrictions on water resources projects, see id. § 1278. Additionally, the CMP: (5) establishes a minimum buffer zone called the River Protection Overlay ("RPO"); (6) creates management zones for lands within the selected boundaries; and (7) institutes a framework called Visitor Experience and Resource Protection. Because the latter three management concepts are not specifically mentioned in the WSRA, but are instead promulgated in the CMP, we describe them more fully below.
 
 1. River Protection Overlay
 
 16
 The RPO is a minimum buffer zone that extends outward from the river channel to a distance of 100 or 150 feet, depending on the elevation, from the Merced's ordinary high water mark. The CMP provides relatively stringent limits on actions to be taken within the RPO. For example, "nonessential facilities," such as bridges, roads, buildings, and levees, can be located within the RPO only if they satisfy two conditions: (1) they must be required for access to or across the river, for health or safety, or for maintenance of historic properties; and (2) they could not perform their functions if they could not be located within the RPO. The CMP permits nonessential facilities already existing within the RPO to remain, however, and to be replaced, repaired, or relocated within the RPO only if such action does not directly and adversely affect ORVs. The CMP also allows for the construction, replacement, repair, and relocation of essential facilities (such as primary roads and electrical infrastructure) within the riverbed and banks if the project is designed to minimize impacts to the free-flowing condition of the river, its tributaries, and backwaters.
 
 2. Management zoning
 
 17
 The CMP defines management zones as areas "for which management directions or prescriptions have been developed to determine what can and cannot occur in terms of resource management, visitor use, access, facilities or development, and park operations." "The purpose of management zoning is to provide overall guidance for decision-making over the long term." Category 1 "wilderness" zones describe areas having the lowest degree of visitor and facility use. Areas falling within Category 2 "diverse visitor experience" zones have at most a moderate range of facility development. Category 3 "developed" zones are characterized by intense visitor use or more developed facilities, or both. These general zoning categories are further subdivided by letter to reflect increasingly intense use within each category.
 
 3. Visitor Experience and Resource Protection
 
 18
 The NPS describes the Visitor Experience and Resource Protection ("VERP") element as the "primary mechanism for addressing user capacity" as required by 16 U.S.C. § 1274(d)(1). In lieu of specific numerical limits on visitors, which the NPS claims would be insufficiently precise given the "wide variety of resources and patterns of usage" in Yosemite, the VERP framework focuses on the prescription and maintenance of selected "desired conditions."
 
 
 19
 The CMP explains that the VERP framework provides "an ongoing, iterative process of determining desired conditions (including desired cultural resource conditions, desired natural resource conditions, and desired visitor experiences), selecting and monitoring indicators and standards that reflect these desired conditions, and taking management action when the desired conditions are not being realized." The CMP, however, establishes no specific indicators or standards to implement the VERP process; instead, it provides examples, such as measuring the percentage of bare ground or exposed roots in a particular area and the number of people encountered on a trail within a particular time frame as possible indicators for protecting biological and recreational ORVs, respectively, from excessive degradation due to overuse. The VERP thus anticipates that user capacities would be addressed by monitoring user impact on the environment, and taking management action to maintain acceptable environmental conditions.
 
 IV. ANALYSIS
 A. User Capacities
 
 20
 The district court erred in determining that the CMP adequately "address[ed]... user capacities" as required by § 1274(d)(1). The current CMP is deficient in its approach to user capacities because its principal method for addressing user capacities, the VERP framework, contains only sample standards and indicators. Thus, the CMP fails to yield any actual measure of user capacities, whether by setting limits on the specific number of visitors, by monitoring and maintaining environmental and experiential criteria under the VERP framework, or through some other method.
 
 
 21
 The WSRA explicitly requires administering agencies to "prepare a [CMP] ... [that] shall address ... user capacities" within three full fiscal years of a WSRS segment's designation. Id. § 1274(d)(1). However, § 1274(d)(1) does not define the phrase "address ... user capacities." In the absence of a statutory definition of the phrase, we look to the plain meaning of its terms. See Hells Canyon Alliance, 227 F.3d at 1177. "Address" means to "deal with or discuss." Random House Webster's College Dictionary 16 (1991). "User" is defined as "a person or thing that [avails oneself of something]," id. at 1468, and "capacity" is "the maximum number that can be received or contained." Id. at 201. Thus, applied to this case, the plain meaning of the phrase "address ... user capacities," is simply that the CMP must deal with or discuss the maximum number of people that can be received at a WSRS. Based on this plain meaning, we do not read § 1274(d)(1) to require that the administering agency advance one particular approach to visitor capacity in all circumstances (e.g., a head count of all entrants to Yosemite).
 
 
 22
 This interpretation of § 1274(d)(1) is buttressed by the interpretive guidelines jointly published in 1982 by the Secretary of Agriculture and the Secretary of the Interior. These "Secretarial Guidelines" are crafted to facilitate greater consistency in the agencies' interpretation of the WSRA. See National Wild and Scenic Rivers System: Final Revised Guidelines for Eligibility, Classification and Management of River Areas, 47 Fed. Reg. 39,454 (Sept. 7, 1982) (the "Secretarial Guidelines"). We defer to the Secretarial Guidelines as an exercise of the administering agencies' authority to resolve ambiguities in the statute they administer. See United States v. Mead, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).
 
 
 23
 The Secretarial Guidelines interpret the WSRA to require the preparation of river "[m]anagement plans [that] state ... the kinds and amounts of public use which the river area can sustain without impact to the [ORVs]," and to mandate ongoing studies to "determine the quantity and mixture of recreation and other public use which can be permitted without adverse impact on the resource values of the river area." 47 Fed. Reg. at 39, 458-59. Although these references to setting limits on the amount or quantity of public use clarify that the WSRA obliges the administering agency to provide actual limits in its CMP, the Secretarial Guidelines do not specify that this obligation can be satisfied only by capping the number of visitors. Thus, we interpret § 1274(d)(1)'s instruction that a CMP must "address ... user capacities" to require only that the CMP contain specific measurable limits on use. See also id. at 39,459 (explaining that § 1281(a) states "a nondegradation and enhancement policy for all designated river areas, regardless of classification").
 
 
 24
 This does not mean that the NPS is precluded from using the VERP to fulfill the user capacities requirement. However, the WSRA does require that the VERP be implemented through the adoption of quantitative measures sufficient to ensure its effectiveness as a current measure of user capacities. If the NPS is correct in projecting that it will need five years fully to implement the VERP, it may be able to comply with the user capacity mandate in the interim by implementing preliminary or temporary limits of some kind.
 
 
 25
 Because the present version of the CMP fails to provide any concrete measure of use, we conclude that it fails sufficiently to address user capacities. Indeed, we note that the NPS's proposed five-year timetable for the implementation of the VERP framework would not satisfy § 1274(d)(1)'s three-full-fiscal-year timetable even if the NPS were to have begun implementation of the VERP immediately upon Congress' designation of the Merced. On remand, the NPS shall adopt specific limits on user capacity consistent with both the WSRA and the instruction of the Secretarial Guidelines that such limits describe an actual level of visitor use that will not adversely impact the Merced's ORVs.
 
 B. WSRA Boundaries at El Portal
 
 26
 The NPS violated the WSRA by drawing the boundaries at the Merced's El Portal administrative site too narrowly. The WSRA requires a CMP to delineate river boundaries that "include an average of not more than 320 acres of land per mile measured from the ordinary high water mark on both sides of the river." 16 U.S.C. § 1274(b). The CMP sets the river boundaries for the seventy-seven miles of the Merced that do not flow through El Portal at a distance of one-quarter mile from the ordinary high water mark on either side of the river. These boundaries are consistent with the statutory acre-age maximum. However, for the approximately four miles flowing through El Portal, the CMP sets the river boundaries to include only the greater of the RPO or the one-hundred-year floodplain, plus adjacent wetlands and meadows.
 
 
 27
 We have not yet decided a case involving WSRA river boundaries, but one of our sister circuits has reasoned that the setting of boundaries is an "administrative act" that falls within the agency's statutory duty to administer the river area "in such manner as to protect and enhance the[ORVs] which caused it to be included in the [WSRS]." Sokol v. Kennedy, 210 F.3d 876, 878 (8th Cir.2000) (remanding for redetermination of boundaries consistent with 16 U.S.C. § 1281(a)). Although Sokol involved boundaries that were potentially overinclusive, because they were not drawn on the basis of the statutorily-required "outstandingly remarkable values" criterion, we agree with the Eighth Circuit's analytic approach. Accordingly, we conclude that the boundaries at El Portal are deficient because they were not devised pursuant to § 1281(a)'s protection and enhancement mandate.
 
 
 28
 While the CMP associates specific ORVs with El Portal, the record does not reflect the precise location of these ORVs or how, in drawing the boundaries, the NPS sought to protect them. The CMP lists five categories of ORVs for El Portal, and provides the following descriptions:
 
 
 29
 Geologic Processes/Conditions — This segment contains a transition from igneous to metasedimentary rocks (metasedimentary rocks are among the oldest in the Sierra Nevada).
 
 
 30
 Recreation — This segment provides a range of river-related recreational opportunities, in particular white-water rafting and kayaking (class III to V) and fishing.
 
 
 31
 Biological — This segment contains riverine habitats such as riparian woodlands and associated federal and state special status species, including Tompkin's sedge and Valley elderberry longhorn beetle and its critical habitat (elderberry shrub). Expanses of north-facing habitat allow unlimited access to the riparian zone for wildlife species.
 
 
 32
 Cultural — This segment contains some of the oldest archeological sites in the Yosemite area, as well as many historic Indian villages and traditional gathering places. River-related historic resources include structures related to early tourism and industrial development.
 
 
 33
 Hydrological Processes — This segment is characterized by continuous rapids.
 
 
 34
 The El Portal segment also falls under the general "scientific" ORV identified by the CMP for the river's main stem "because the river watershed is largely within designated Wilderness in Yosemite National Park."
 
 
 35
 The record reflects that some of El Portal's ORVs are not protected by the present boundaries and, indeed, that not all of El Portal's ORVs have been fully located. For example, the CMP points out a significant deficiency with respect to El Portal's cultural ORVs:
 
 
 36
 A systematic inventory for ethnographic resources has not been undertaken for El Portal.... [S]everal individuals and families have traditional ties to this area. Redbud, willow, sourberry, and other plant materials are known to be gathered here. There are at least three known cemeteries, two of which were used in historic times and are the burial places for ancestors of some local Indian families.
 
 
 37
 In addition, although the CMP notes that a "comprehensive evaluation of cultural landscapes and historic structures at the El Portal Administrative Site, based on National Register criteria, has been completed," it does not discuss whether such landscapes and structures are located within the present boundaries or if their protection and enhancement were considered when the boundaries were drawn. Indeed, the record reflects that NPS employees expressed concern about the effect of the boundaries on cultural ORVs during the drafting stage of the CMP. For example, one employee noted that "there are river-related archeological sites, considered part of the cultural resource ORV in El Portal, that lie outside the 100-y[ea]r floodplain... that would be directly and adversely affected by administrative purposes (e.g., construction of employee housing at Hillside West)." Such omissions demonstrate that the CMP's boundaries at El Portal could not possibly have been promulgated to protect and enhance such ORVs.
 
 
 38
 In concluding that the river boundaries at El Portal were improperly drawn, we do not, as the NPS fears, establish "a preference for ... includ[ing] the absolute maximum number of acres on every part of the designated river," or place a "special burden of justification on an agency if it chooses less than the absolute maximum average." Instead, we hold that there is one burden of justification that generally applies to an administering agency's determination of river boundaries: Boundaries set within the WSRA's acreage requirement, regardless where such boundaries fall within the statutory range, must be drawn so as to protect and enhance the ORVs causing that area to be included within the WSRS. See 16 U.S.C. § 1281(a); Sokol, 210 F.3d at 879; 47 Fed. Reg. at 39,459. Because the NPS failed to apply this standard, the CMP's present boundaries at El Portal were not determined in accordance with law. Accordingly, on remand the NPS must redetermine the river area boundaries at El Portal under the proper standard. See 5 U.S.C. § 706(2)(A).
 
 
 39
 C. Specificity of Data and Information in the CMP
 
 
 40
 With the exception of the user capacities and river boundaries discussed above, the CMP was prepared with sufficiently specific data and information to satisfy § 1281(a)'s goal of protecting and enhancing ORVs. Moreover, the CMP contains satisfactory detail under both the WSRA and NEPA to fulfill its role as a programmatic management plan.
 
 1. The Wild and Scenic Rivers Act
 
 41
 The WSRA itself supplies little guidance as to the data and information requirements for a CMP. The WSRA's only qualitative instruction concerning a designated river's management plan is its use of the descriptive term "comprehensive," which the statute does not define. Nonetheless, the three-volume CMP, purportedly based upon "the best data available at the time the plan was drafted, including nearly 100 years of study and observation of river processes," falls well within the ordinary meaning of comprehensive. The statute's requirement that a CMP be completed within three full fiscal years of designation demonstrates that Congress envisioned a non-qualitative limit on the amount of additional data to be gathered. See 16 U.S.C. § 1274(d)(1).
 
 
 42
 The WSRA also requires the CMP to "address resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of [the WSRA]." Id. For reasons discussed above, § 1274(d)(1)'s use of the word "address," absent further statutory definition, indicates that the courts should defer to the agency's reasonable determination of the level of specificity needed for the data used to promulgate a CMP.
 
 
 43
 Moreover, in contrast to the user capacity mandates, the Secretarial Guidelines for § 1274(d)(1) provide no useful interpretive guidance as to the data gathering standard for a CMP. They merely require that, in addition to complying with the WSRA and other applicable laws, a management plan must state:
 
 
 44
 [g]eneral principles for any land acquisition which may be necessary; the kinds and amounts of public use which the river area can sustain without impact to the values for which it was designated; and specific management measures which will be used to implement the management objectives for each of the various river segments and protect esthetic, scenic, historic, archeologic and scientific features.
 
 
 45
 47 Fed. Reg. at 39,458. There is no indication in the Secretarial Guidelines that a programmatic approach to a CMP necessarily circumvents the WSRA's "nondegradation and enhancement policy for all designated river areas, regardless of classification." Id.
 
 2. The National Environmental Policy Act
 
 46
 Nor is a programmatic approach per se invalid under NEPA.[2] An agency's planning and management decisions may occur at two distinct administrative levels:
 
 
 47
 (1) the "programmatic level" at which the[agency] develops alternative management scenarios responsive to public concerns, analyzes the costs, benefits and consequences of each alternative in an [EIS], and adopts an amendable [management] plan to guide management of multiple use resources; and (2) the implementation stage during which individual site specific projects, consistent with the [management] plan, are proposed and assessed.
 
 
 48
 Ecology Ctr., Inc. v. United States Forest Serv., 192 F.3d 922, 923 n. 2 (9th Cir.1999). An EIS for a programmatic plan (such as the CMP) must provide "sufficient detail to foster informed decision-making," but "site-specific impacts need not be fully evaluated until a critical decision has been made to act on site development." N. Alaska Envtl. Ctr. v. Lujan, 961 F.2d 886, 890-91 (9th Cir.1992); see also Resources Ltd., Inc. v. Robertson, 35 F.3d 1300, 1306 (9th Cir.1993) (rejecting argument that EIS for forest land and resource management plan lacked sufficiently specific data to ensure compliance with water quality standards, and noting that "specific analysis is better done when a specific development action is to be taken, not at the programmatic level").
 
 
 49
 NEPA requires that an EIS be prepared for all "major Federal actions significantly affecting the ... human environment." 42 U.S.C. § 4332(2)(C). Although NEPA requires that the NPS evaluate the consequences of its action at an early stage in the project's planning process, that requirement is tempered by (1) "the statutory command that [a reviewing court] focus upon a proposal's parameters as the agency defines them," and (2) "the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences." Block, 690 F.2d at 761. Thus, NEPA requires a full evaluation of site-specific impacts only when a "critical decision" has been made to act on site development — i.e., when "the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to project at a particular site." Id. The determination of whether a "critical decision" has been made begins with an accurate description of the NPS's proposed action. Id.
 
 
 50
 As the Merced River CMP itself states, it "does not specify detailed actions, but provides broad guidelines for future approved actions that affect the river corridor." The CMP's land-use management tools, the RPO and management zoning, serve two functions. First, they determine what future uses will be considered in a particular area. Second, they guide the NPS in deciding whether to remove an existing non-conforming use from a particular area. Because a subsequent and full environmental review is contemplated for either type of decision, neither function constitutes "an irreversible and irretrievable commitment of the availability of resources." Block, 690 F.2d at 761. Indeed, the CMP states that it does not "irreversibly or irretrievably commit[]" any natural resources, and that the only possible "permanent and irreversible" loss would occur if in the future the Park Service were to decide to remove a historic bridge (i.e., a cultural value) obstructing the river corridor and causing severe scouring of the river channel.
 
 
 51
 Applying the principles of the WSRA and NEPA, we conclude that the NPS did not abuse its discretion in preparing the CMP as a programmatic document, and that the CMP's EIS contains sufficiently specific data and information for such a purpose. We agree with the NPS that it must "prepare appropriate environmental review ([pursuant to the] National Environmental Policy Act, National Historic Preservation Act, and other relevant legislation) for ... future actions" guided by the CMP, and anticipate that such review will include, where appropriate, data-gathering and analysis of system-wide impacts.
 
 
 52
 D. Cooperation with water pollution control agencies
 
 
 53
 Lastly, we conclude that the NPS has adequately complied with WSRA's mandate to "cooperate with the Administrator, Environmental Protection Agency and with the appropriate State water pollution control agencies for the purpose of eliminating or diminishing the pollution of waters of the river." 16 U.S.C. § 1283(c). This claim arises from a number of sewage spills and discharges into the Merced from NPS facilities, including a July 27, 2000 discharge of approximately 200,000 gallons of raw sewage and water. Following this discharge, the California Regional Water Quality Control Board (the "Board"), the appropriate state water pollution control agency under § 1283(c), issued a Cleanup and Abatement Order on August 2, 2000, requiring the NPS to file certain reports and to "employ whatever means are necessary to abate future discharges."
 
 
 54
 Friends asserts that the NPS's failure to prevent subsequent spills violates § 1283(c) and that the district court applied an erroneous legal standard when it stated that although the NPS's "record in this area is clearly not stellar[,] ... it is not at such an abysmal level to constitute actual failure to cooperate with the Board." Friends of Yosemite Valley, 194 F.Supp.2d at 1116. We conclude that the district court did not apply an erroneous legal standard, but was instead making a factual determination. See Wilderness Soc'y v. Tyrrel, 918 F.2d 813, 820 (9th Cir.1990) (explaining that "the question of whether the [administering agency] `cooperated'[sufficiently to satisfy § 1283(c) ] is one of fact"). Because the district court had jurisdiction and its determination was not clearly erroneous, we affirm its determination that the NPS did not violate § 1283(c).
 
 1. Jurisdiction
 
 55
 The NPS raises a variety of challenges to the district court's jurisdiction over Friends' § 1283(c) claim. It first argues this claim is preempted by the Clean Water Act's authorization of citizen suits. See 33 U.S.C. § 1365(a)(1) (authorizing citizen to sue over alleged "violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation"). The NPS complains that because § 1365 authorizes suits for point-source pollution, including sewage discharges like those at issue here, Friends should be limited to a claim brought under the Clean Water Act, which requires a potential plaintiff to provide sixty days' notice prior to filing suit. See id. § 1365(b). Friends is barred from bringing a Clean Water Act claim, the NPS asserts, because it failed to give the required notice. We find the NPS's arguments to be meritless.
 
 
 56
 The Clean Water Act explicitly permits a party to seek relief under other statutes: "Nothing in this section shall restrict any right which any person ... may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)." 33 U.S.C. § 1365(e); see also Or. Natural Res. Council v. United States Forest Serv., 834 F.2d 842, 851 n. 15 (9th Cir.1987) ("[W]e believe that the savings clause preserves rights created by a separate statute such as the APA.").
 
 
 57
 We also reject the NPS's argument that we have previously construed the Clean Water Act to provide an exclusive remedy for claims concerning point-source pollution. See Or. Natural Res. Council, 834 F.2d at 850. Oregon Natural Resources Council dealt with non-point-source pollution, which does not fall under the Clean Water Act's citizen suit provision; hence we concluded that the Clean Water Act's notice requirement did not apply. 834 F.2d at 850. In allowing that claim to continue under the APA, we cautioned that
 
 
 58
 plaintiffs seeking relief under the [Clean Water Act] may [not] circumvent the notice requirement of the citizen suit provision by resorting to the APA. Where plaintiffs may otherwise proceed under the citizen suit provision, they should not be allowed to bypass the explicit requirements of the Act established by Congress through resort to [42 U.S.C. § ]1983 or the APA.
 
 
 59
 Id. at 851. Unlike in Oregon Natural Resources Council, we deal here with a claim arising under a separate statute, the WSRA, and not the Clean Water Act. We have formerly recognized that a private party may bring a "failure to cooperate" claim for violation of § 1283(c). See Tyrrel, 918 F.2d at 820 (remanding for district court to "determine whether, as a factual matter, the [administering agency] fulfilled its obligation of cooperation under [16 U.S.C. § 1283(c)]").
 
 
 60
 Nor can Friends' WSRA claim be viewed as an improper attempt to circumvent the Clean Water Act, because the causes of action under the two statutes differ in a meaningful way. The Clean Water Act allows suit to enforce an effluent standard or limitation, and the WSRA requires the administering agency to cooperate with various agencies. This distinction allows a plaintiff to bring suit under the WSRA without thwarting the purpose of the notice requirement imposed by the Clean Water Act:
 
 
 61
 The notice requirement reflects the intent of Congress to allow the [agency] to react to citizen complaints before suit is filed and prevent unnecessary litigation. That aim is frustrated if a citizen complainant may bypass the notice requirement by resorting to the APA remedy for conduct already reviewable by the citizen-suit provision.
 
 
 62
 Brem-Air Disposal v. Cohen, 156 F.3d 1002, 1005 (9th Cir.1998). Thus, by requiring notice, the Clean Water Act gives an agency the chance to remedy any violations of standards, limitations, or orders by bringing such failures to the agency's attention and affording it time to react prior to suit being filed.
 
 
 63
 Friends' WSRA claim, on the other hand, asserts that the NPS has consistently failed to avoid violations, not that it was unaware of an existing violation. Accordingly, requiring notice under the WSRA would have little practical effect on whether the NPS has satisfied its obligation under § 1283(c). Indeed, the very thrust of Friends' § 1283(c) claim is that the NPS is insufficiently responsive to matters of which the agency is well aware.
 
 
 64
 We also reject the NPS's argument that there existed no final agency action for the district court to review. The NPS has waived this objection, which "does not implicate subject matter jurisdiction," by failing to raise it in the district court. Idaho Watersheds Project v. Hahn, 307 F.3d 815, 830 (9th Cir.2002) (noting that jurisdiction to review agency action was conferred by 28 U.S.C. § 1331, not by the APA); see also Friends of Yosemite Valley, 194 F.Supp.2d at 1114-16 (discussing appellants' "cooperation" claim without mentioning any objection based on lack of final agency action).
 
 2. Merits
 
 65
 Turning to the merits of Friends' § 1283(c) claim, we affirm the district court's finding that it lacks merit. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse even though convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently." Interstellar Starship Servs., Ltd. v. Epix, Inc., 304 F.3d 936, 941 (9th Cir.2002). The district court's opinion demonstrates that it thoroughly evaluated the entire record, a fair reading of which supports a finding that the NPS regularly complied with its reporting obligations and promptly remedied equipment failures and clogs, even if its efforts did not prevent subsequent spills or discharges. Because the district court's determination that the NPS's performance did not fall to "such an abysmal level to constitute actual failure to cooperate with the Board" fairly characterizes the factual record, the district court did not clearly err.
 
 V. CONCLUSION
 
 66
 For the reasons stated, we conclude that the CMP and its EIS contain sufficient data for a programmatic plan under the WSRA and NEPA, and that the NPS did not violate its duty to cooperate with water pollution agencies as required by 16 U.S.C. § 1283(a). We further conclude that the CMP violates the WSRA by insufficiently addressing user capacities and improperly setting river area boundaries within El Portal. We remand for the district court to enter an appropriate order requiring the NPS to remedy these deficiencies in the CMP in a timely manner. Inasmuch as the NPS was supposed to have completed a CMP for the Merced River some twelve years ago, we would also expect that the NPS would implement, as soon as is practicable, temporary or provisional measures designed to avoid environmental degradation pending the completion of its task.
 
 
 67
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Though a named plaintiff in the prior action, the Sierra Club is not a party to this appeal. It did, however, file an amicus curiae brief in this appeal — along with sixty other conservation groups, local governments, chambers of commerce, and private individuals
 
 
 [2]
 We apply a "rule of reason" standard to review the adequacy of an agency's EIS, asking "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences."Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir.2001), cert. denied 537 U.S. 822, 123 S.Ct. 101, 154 L.Ed.2d 31 (2002). This standard involves "a pragmatic judgment whether the EISs form, content and preparation foster both informed decision-making and informed public participation," id. (quoting California v. Block, 690 F.2d 753, 761 (9th Cir.1982)), and is essentially the same as review for abuse of discretion. See Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1376 (9th Cir.1998).